# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3944

_____

United States of America,

        Appellee,

v.

Everett Kyle Hall, Also
Known as Eric, Also Known
as Shorty,

        Appellant.

Appeals from the United States
District Court for the Western
District of Missouri.

_____

No. 97-4170

_____

United States of America,

        Appellee,

v.

Randall Joe Hall,

        Appellant.

_____

No. 97-4171

_____

| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Roy Lee Hall, | * |
| | * |
| Appellant. | * |

_____

Submitted:  June 9, 1998

Filed:  March 30, 1999

_____

Before RICHARD S. ARNOLD and MORRIS SHEPPARD ARNOLD, Circuit Judges, and PANNER,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

After a seven-day trial, a jury convicted brothers Everett and Randall Hall and Roy Hall (who is not related to Everett and Randall Hall) of conspiracy to distribute methamphetamine and to possess methamphetamine with the intent to distribute it.  See 21 U.S.C. § 841(a)(1),  § 841(b)(1)(A)(viii), § 846; see also United States v. Hall, 116

_____

[1]The Honorable Owen M. Panner, United States District Judge for the District of Oregon, sitting by designation.

-2-

F.3d 1253 (8th Cir. 1997), cert. denied, 118 S. Ct. 1106 (1998), and United States v. Hall, 85 F.3d 367 (8th Cir. 1996). The district court[2] sentenced each of the defendants to 150 months in prison for that crime. The jury also convicted Everett Hall of possession of an unregistered silencer. See 26 U.S.C. § 5841, § 5861(d), § 5871; see also 18 U.S.C. § 921(a)(3)(C), § 921(a)(24), and 26 U.S.C. § 5845(a)(7). The district court sentenced him to 120 months in prison for that crime (to run concurrently with his sentence for conspiracy).

Each of the defendants appeals both his conviction and his sentence. We affirm both the convictions and the sentences.

## I.

One count of the indictment charged Everett Hall with possession of an unregistered silencer. Mr. Hall asserts that he did not know that the alleged silencer was a "firearm" under the law, see 18 U.S.C. § 921(a)(3)(C), 26 U.S.C. § 5845(a)(7), did not know that the item in question could in fact function to diminish the sound of a gun, and was not shown to have possessed the item in question (all of which assertions we discuss in a later section), but he does not dispute that the alleged silencer was not registered. See 26 U.S.C. § 5841(a).

Before trial, however, Mr. Hall pointed out that the applicable statutory definition of "silencer," see 18 U.S.C. § 921(a)(3)(C), § 921(a)(24), and 26 U.S.C. § 5845(a)(7), and the statutes prohibiting the possession of an unregistered silencer, see 26 U.S.C. § 5841, § 5861(d), § 5871, lack a requirement that the silencer in question be connected in some way with interstate commerce. He then contended that, with respect to his case, the commerce clause, see U.S. Const. art. I, § 8, cl. 3, provided no authority for prosecuting him under those statutes and that since those statutes were the

_____

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

basis for one count of the indictment, that count should be dismissed. The trial court denied the motion.

On appeal, the government evidently concedes that it presented no proof of a direct connection between interstate commerce and the alleged silencer. The government asserts, however, that even if Mr. Hall possessed the alleged silencer solely within one state (as he implicitly argues), his act in so doing was within the power of Congress to regulate under the commerce clause. We disagree.

In United States v. Lopez, 514 U.S. 549, 567 (1995), the Supreme Court stated that the commerce clause of the Constitution gives Congress the power to regulate even intrastate activities if those activities "might, through repetition elsewhere, substantially affect [some] sort of interstate commerce." In evaluating whether a specific intrastate activity is legitimately so characterized, and thus whether a specific criminal statute will be upheld against a challenge based on the commerce clause, at least three inquiries are relevant.

First, do the relevant criminal statutes contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the [silencer] possession in question affects interstate commerce"? Id. at 561. None of the relevant statutes in this case contains such an element.

Second, does the intrastate activity arise out of, or is it connected with, a commercial transaction, so that the activity is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated"? Id. Mr. Hall contends that the possession of a silencer solely within one state has "nothing to do with 'commerce' or any sort of economic enterprise," id., and we agree with that contention.

-4-

Finally, we ask, in enacting the criminal statutes at issue, did Congress, or "even [a] congressional committee," make "legislative findings ... regarding the [intrastate activity's] effect upon interstate commerce"? Id. at 562. We note in this regard that "Congress normally is not required to make formal findings as to the substantial burdens that an [intrastate] activity has on interstate commerce," id., but that "congressional findings ... enable [the courts] to evaluate the legislative judgment that the [intrastate] activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye," id. at 563. To answer this inquiry in specific regard to this case, we take a closer look at the origin of the criminal statutes at issue here.

All of the statutory sections relevant to the possession of unregistered silencers are subsequent incarnations of provisions that were originally part of the National Firearms Act of 1934. See Act of June 26, 1934, Public Law No. 73-474, 48 Stat. 1236-40, § 1(a), § 5(a), § 14. See also, respectively, 1939 I.R.C., ch. 25, 53 Stat. 292-94, ch. 27, 53 Stat. 393, § 2733(a), § 3261(b), § 2729, and, respectively, 1954 I.R.C., ch. 53, 68A Stat. 721-29, § 5848(1); § 5841, § 5851; § 5861.

One of those derivative provisions, see 18 U.S.C. § 921(a)(3)(C), was rewritten slightly and amended in the Omnibus Crime Control and Safe Streets Act of 1968, Public Law No. 90-351, 82 Stat. 197-239, § 902, reprinted in 1968 U.S.C.C.A.N. 237, 271-81. The same act renumbered the statutory section associated with that provision, giving it the section number currently in use. See id. The remainder of those derivative provisions were rewritten slightly and amended in the Gun Control Act of 1968, Public Law No. 90-618, 82 Stat. 1213-36, § 201, reprinted in 1968 U.S.C.C.A.N. 1397, 1413-23. In 1986, the statutory sections associated with those provisions were rearranged and renumbered, giving them the section numbers currently in use. See Tax Reform Act of 1986, Public Law 99-514, 100 Stat. 2085-2963, § 2, reprinted in 1986 U.S.C.C.A.N. 2095.

Throughout the multiple transitions described above, however, the content from the original provisions remained essentially the same in all particulars material to this case. See, respectively, 18 U.S.C. § 921(a)(3)(C), 26 U.S.C. § 5845(a)(7); § 5841, § 5861(d); § 5871. The one statutory section relevant to this case that was not originally part of the National Firearms Act of 1934, moreover, is simply a clarification of a term that was already part of the original act or one of its later versions. See 18 U.S.C. § 921(a)(24), relative to § 1(a) of the original act, defining "silencer" as "any device for silencing ... the report of a ... firearm." Because the criminal statutes relevant to this case are all derivations from (or a relatively minor clarification of) the original provisions of the National Firearms Act of 1934, we do not think it improper to consult the legislative history of that act in determining whether Congress made findings with respect to the effect on interstate commerce of the intrastate activity at issue here, i.e., the possession of a silencer solely within one state.

The committee reports (identical in both houses of Congress) on the bill that became the original National Firearms Act of 1934 contained no findings. See H.R. Rep. No. 73-1780 (1934); see also S. Rep. No. 73-1444 (1934). Nor did the committee reports on the bills that became the 1968 legislation on firearms. See, with respect to the Omnibus Crime Control and Safe Streets Act of 1968, S. Rep. No. 90-1097, reprinted in 1968 U.S.C.C.A.N. 2112, and, with respect to the Gun Control Act of 1968, H.R. Rep. No. 90-1577, reprinted in 1968 U.S.C.C.A.N. 4410, and H.R. Rep. No. 90-1956, reprinted in 1968 U.S.C.C.A.N. 4426. Congress added a definition of "silencer" to the statutes, see 18 U.S.C. § 921(a)(24), through the Firearms Owners' Protection Act of 1986, Public Law No. 99-308, 100 Stat. 449-61, § 101(6), reprinted in 1986 U.S.C.C.A.N. 449, but the committee report on the bill that became that act included no findings.

We conclude, then, that Congress made no legislative findings, either explicit or implicit, from which we may reliably conclude that the intrastate possession of silencers imposes "substantial burdens," Lopez, 514 U.S. at 562, on interstate commerce. In

light of the absence of such findings, the absence of a jurisdictional element in the relevant statutes, the absence of a commercial transaction with regard to Mr. Hall's possession of the alleged silencer, and the absence of proof of a connection between interstate commerce and the alleged silencer, we hold that the relevant count of the indictment against Mr. Hall cannot be sustained under the commerce clause.

## II.

We turn consequently to the issue of whether the taxing clause, see U.S. Const. art. I, § 8, cl. 1, provided the authority to prosecute Everett Hall under the statutes in question in the relevant count, as the government also contends. We note that although the government cited (in both its brief and its oral argument) the taxing clause as an alternative source for the authority to prosecute Mr. Hall under the statutes in question, Mr. Hall did not address the taxing clause in either a reply brief or his oral argument. We have thus had to anticipate the most significant arguments that he might have raised in that respect.

We see no need to address every challenge that has ever been brought to the power of Congress under the taxing clause with respect to the statutes relevant to Mr. Hall's case. We do address, however, what we consider to be the two most significant of those challenges, namely, that the statutes in question were enacted in violation of the tenth amendment and that the pertinent registration and tax payment requirements, see 26 U.S.C. § 5821(a), § 5821(b), § 5822, § 5841, § 5861(d), are punitive in nature (and therefore criminal punishment) and consequently outside the civil power of taxation. (Other challenges have been based on the ex post facto clause, the right to bear arms, the right of protection against self-incrimination, the due process clause, the equal protection clause, the prohibition against cruel and unusual punishment, and the right to privacy.)

In United States v. Sanchez, 340 U.S. 42, 43-44 (1950), the Supreme Court considered the scope of the taxing clause with respect to a statute that imposed a tax

-7-

on the transfer of marijuana, to be paid by either the transferor or the transferee, with the amount and the liable person both governed by whether the transferee had previously registered with the federal government, as mandated by a separate statute. (At that time, certain persons could legally possess marijuana. These particular statutes were repealed in 1970, when the federal drug laws were revised.) The defendant in that case (a transferor) asserted, first, that the tax had the effect not only of regulating but also of deterring traffic in marijuana and, second, that the amount of the tax imposed if the transferee had not previously registered was so great as to constitute criminal punishment rather than a tax. Id. at 44.

With respect to the "regulatory character" of the tax, the Supreme Court stated that it was "beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed," despite the fact that "the revenue obtained is obviously negligible," that "the revenue purpose may be secondary," or that the tax is imposed on "activities which Congress might not otherwise [be permitted to] regulate." Id. Although the Court did not expressly characterize this analysis as responsive to a tenth-amendment challenge (involving a power reserved to the states because not delegated to Congress by the Constitution), all three of the cases that the Court relied on in that portion of the opinion, see id. at 44-45, were premised in relevant part on tenth-amendment or analogous arguments. See Sonzinsky v. United States, 300 U.S. 506, 511-12 (1937) (tenth-amendment argument), regarding an annual license tax imposed on dealers in firearms; Magnano Co. v. Hamilton, 292 U.S. 40, 44-47 (1934) (analogous argument), regarding a state tax on intrastate margarine sales that was different from the state tax on intrastate butter sales; and Hampton and Co. v. United States, 276 U.S. 394, 400, 404, 411-13 (1928) (analogous argument), regarding a tax on imports from countries where the relevant production costs were lower than in the United States.

With respect to the "penal nature" of the tax, United States v. Sanchez, 340 U.S. at 44, the Supreme Court stated that since the transfer precipitating the tax was not

itself illegal, "the tax can be properly called ... civil rather than ... criminal" in nature. Id. at 45. Cf. Department of Revenue v. Kurth Ranch, 511 U.S. 767, 777-82 (1994) (a tax that was not remedial in essence, was triggered by an illegal act, and was imposed after a separate criminal prosecution for the same act, was held to be punitive in nature and therefore violative of the double jeopardy clause), and Padavich v. Thalacker, 162 F.3d 521, 522-23 (8th Cir. 1998) (a tax that was not triggered solely by an illegal act, and was not imposed only after a separate criminal prosecution for the same act, was held not to be punitive in nature and therefore not violative of the double jeopardy clause). The Court in United States v. Sanchez, 340 U.S. at 45-46, further stated that the civil nature of the tax was not altered by the fact that the amount of the tax was much greater if the transferee had not previously registered with the federal government.

We see nothing in the Supreme Court's reasoning in United States v. Sanchez that would compel a different conclusion with respect to the registration requirement that was imposed in connection with the transfer tax at issue in that case. We see nothing in the tax and registration statutes at issue in Everett Hall's case, moreover, to distinguish them from the analogous statutes considered in United States v. Sanchez. As the Court remarked in Sonzinsky, 300 U.S. at 513, with respect to similar provisions applicable to firearms dealers, the "registration provisions ... are obviously supportable as in aid of a revenue purpose."

Other courts have considered whether the scope of the taxing clause was sufficiently broad to allow Congress to enact the particular statute under which Mr. Hall was prosecuted, see 26 U.S.C. § 5861(d), which makes it a crime for the possessor of a "firearm" to have an unregistered one. Noting that even though the statutes impose the duty of registration on the maker or the transferor of a "firearm," and in fact have no provision authorizing (what we might describe as) a "mere" possessor to register the "firearm," various courts have still upheld the enactment of § 5861(d) as within the scope of the taxing clause. See, e.g., United States v. Gresham,

118 F.3d 258, 263-64 (5th Cir. 1997), <u>cert.</u> <u>denied</u>, 118 S. Ct. 702 (1998); <u>United States v. Aiken</u>, 974 F.2d 446, 448 (4th Cir. 1992); and <u>United States v. Tankersley</u>, 492 F.2d 962, 967 (7th Cir. 1974). <u>See</u> <u>also Milentz v. United States</u>, 446 F.2d 111, 112-13 (8th Cir. 1971).

In concluding that Congress had the authority under the taxing clause to make it a crime to possess an unregistered "firearm," the courts have explained that § 5861(d) is "in aid of a revenue purpose," <u>Sonzinsky</u>, 300 U.S. at 513, by virtue of the fact that § 5861(d) helps the government to learn "the chain of possession of a firearm" and thus to identify the maker liable for the tax, <u>Hunter v. United States</u>, 73 F.3d 260, 262 (9th Cir. 1996) (<u>per</u> <u>curiam</u>), <u>see</u> <u>also United States v. Dodge</u>, 61 F.3d 142, 146 (2d Cir. 1995), <u>cert.</u> <u>denied</u>, 516 U.S. 969, 1000 (1995), and <u>United States v. Jones</u>, 976 F.2d 176, 184 (4th Cir. 1992), <u>cert.</u> <u>denied</u>, 508 U.S. 914 (1993). At least one court has further commented that § 5861(d) encourages the makers of "firearms" to register them and to pay the relevant tax because, otherwise, those makers "face the possibility of being unable to sell the ['firearms'] to anyone," <u>United States v. Aiken</u>, 974 F.2d at 448.

We agree with the reasoning that those courts offered. We therefore hold that Congress had the authority under the taxing clause to define as a crime the possession of an unregistered silencer. <u>See</u> <u>also United States v. Pearson</u>, 8 F.3d 631, 633 (8th Cir. 1993), <u>cert.</u> <u>denied</u>, 511 U.S. 1126 (1994), citing with apparent approval <u>United States v. Tous</u>, 461 F.2d 656, 657 (9th Cir. 1972) (<u>per</u> <u>curiam</u>), which held that § 5861(d) was within the scope of the taxing clause.

## III.

The government obtained and executed search warrants for the separate premises in which Everett Hall and Randall Hall lived. The basis for those warrants was an affidavit from an agent of the Drug Enforcement Administration (DEA) that related various information supplied by two confidential informants. Each of the Hall brothers

moved under Fed. R. Crim. P. 12(b)(3) to suppress the evidence obtained in those searches because of material omissions from and misrepresentations in the DEA agent's affidavit. They asserted that the DEA agent deliberately or recklessly failed to include in the affidavit the criminal history, the prior use of "numerous aliases," the contemporaneous arrest and detention for possession of stolen property (and, presumably, concomitant motive to try to strike a deal by providing false information about the Hall brothers), the "mental instability," and the "long-time drug abuse" of one of the confidential informants (whose identity the Hall brothers had discerned). The Hall brothers also asserted that the information supplied by that confidential informant to the DEA agent was insufficiently reliable, not detailed enough, uncorroborated, and untrue and, accordingly, that the DEA agent's representations in the affidavit were deliberately false or recklessly made.

The trial court denied the motions to suppress without a hearing. On appeal, the Hall brothers challenge the trial court's denial of a hearing and of their motions to suppress. We review for an abuse of discretion the trial court's decision on whether to hold an evidentiary hearing on the validity of the search warrants. See, e.g., United States v. Hiveley, 61 F.3d 1358, 1360 (8th Cir. 1995) (per curiam); see also 3A C. Wright, Federal Practice and Procedure: Criminal 2d § 801 at 191 (1982). We review de novo the trial court's ruling on the motions to suppress, evaluating only for clear error, however, any findings of fact by the trial court and giving appropriate deference to the inferences apparently drawn from those facts by law enforcement officers, the court that issued the search warrants, and the trial court. See, e.g., Ornelas v. United States, 517 U.S. 690, 691, 699 (1996); see also Illinois v. Gates, 462 U.S. 213, 240, 245 (1983), and United States v. Weinbender, 109 F.3d 1327, 1329 (8th Cir. 1997).

To be entitled to a hearing on a motion to suppress evidence obtained pursuant to a search warrant that was issued in response to an affidavit, a defendant's assertions with respect to the trustworthiness of the affidavit "must be more than conclusory." Franks v. Delaware, 438 U.S. 154, 171 (1978). The defendant's motion must amount

-11-

to a "substantial preliminary showing," id. at 170, of "deliberate falsehood or of reckless disregard for the truth, and ... must be accompanied by an offer of proof. ... The deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant.... Finally, ... if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Id. at 171-72.

We have applied the above criteria, in slightly modified form, to a defendant's assertions of material omissions from a search warrant. See, e.g., United States v. LaMorie, 100 F.3d 547, 555 (8th Cir. 1996). In those circumstances, we require the defendant to make a "substantial preliminary showing," Franks, 438 U.S. at 171, "that the affiant omitted facts with the intent to make, or in reckless disregard of whether the omissions made, the affidavit misleading, and that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." LaMorie, 100 F.3d at 555.

With respect to the material omissions alleged by the Hall brothers, the DEA agent's affidavit did state that the confidential informant in question had admitted committing "acts of prostitution" over a two-month period and participating in "the theft of about 20 vehicles" in that same period. A court issuing the search warrants would manifestly have been aware, therefore, that the confidential informant was not "a model citizen," LaMorie, 100 F.3d at 555, and possibly (or probably) had a criminal history and had used aliases. Accordingly, we reject the argument that the DEA agent's failure to include in the affidavit information about the confidential informant's criminal history and her use of aliases made the affidavit so misleading that it could not have supported the issuance of the warrants if those facts had been included. See, e.g., id.

Nor do we believe that the omission from the affidavit of information about the confidential informant's contemporaneous arrest and detention for possession of stolen property (and potential motive, therefore, to strike a deal for herself by providing false

information about the Hall brothers) compromised the affidavit to such an extent that it could not have supported a finding of probable cause if that fact had been included. We have rejected such contentions in the past, concluding, as a matter of law, that courts issuing search warrants are aware of the possibility that a confidential informant may be seeking leniency in his or her own situation. See, e.g., United States v. Gladney, 48 F.3d 309, 315 (8th Cir. 1995).

With respect to the absence in the affidavit of any reference to the confidential informant's alleged "mental instability" and "long-time drug abuse," we observe that the only specific relevant information provided by Everett Hall or Randall Hall in the motions to suppress was one unsworn statement that "subsequent to the search," the confidential informant was "hospitalized for mental problems" and one unsworn statement that the confidential informant was "a known drug addict with a heavy dependency on drugs." The only assertion, however, that the DEA agent was even aware of those two alleged facts when he gave his affidavit was yet another unsworn statement to the effect that the DEA agent had "a prior romantic connection" with a sister of Everett Hall and Randall Hall, had previously been at the premises to be searched, and had failed to disclose "personally known information that would have ... drawn into question" the information that the confidential informant supplied in support of the affidavit. In our view, the Hall brothers' unsworn statements fall far short as an offer of proof that would require an evidentiary hearing. Cf. United States v. Crook, 936 F.2d 1012, 1014 (8th Cir. 1991), cert. denied, 502 U.S. 1075 (1992).

To be entitled to a hearing on their motions to suppress because of deliberately false or recklessly made statements in (as contrasted with deliberate or reckless omissions from) the DEA agent's affidavit, the Hall brothers had to cast doubt on the veracity of the DEA agent, see Franks, 438 U.S. at 171; thus aspersions with respect to the confidential informant herself were useful only indirectly, that is, as support for the argument that the DEA agent's statements about the confidential informant's reliability, specificity, collateral support, and truthfulness were deliberately false or

-13-

recklessly made. (We realize that as a practical matter, those two evaluations are very closely entwined; we outline the conceptual framework above solely to emphasize the exact contours of the relevant inquiry.) In this regard, we consider initially the alleged untrustworthiness of the DEA agent's statements that the confidential informant in question was "reliable" and had, "on prior occasions, furnished information ... concerning stolen property which resulted in the arrest and conviction of individuals involved."

The Hall brothers' motions to suppress offered only three assertions about the confidential informant's past reliability, namely, that her "information ... concerning stolen property" might have resulted from her own involvement in that theft, that she might have "merely snitched out" her comrades in that theft, and that her information was not described as proving "to be accurate as to where any stolen property was." We consider the first two of those assertions actually to be supportive of the DEA agent's representations about the confidential informant's past reliability and the third one to relate to a subject of relative insignificance.

The motions to suppress also offered assertions that because of the confidential informant's failure to describe in detail to the DEA agent "Everett Hall, his family, or his residence," "despite [her] allegations of some 30 trips to [that] residence," and because of the confidential informant's admitted involvement "in both drugs and prostitution," the DEA agent could not in good faith have believed that the confidential informant was a credible person. In neither their motions to suppress nor their briefs on appeal, however, did the Hall brothers offer any authority for the proposition that those circumstances are somehow critical to an evaluation of a confidential informant's credibility.

The motions to suppress offered additional assertions that the information that was provided by the confidential informant was uncorroborated, thus suggesting that the DEA agent could not reasonably have decided that the confidential informant's

-14-

information was believable. The only specific information so challenged, though, was described in Everett Hall's motion, which directed attention to the confidential informant's allegations that in one three-month period she observed methamphetamine in quantities of "up to one pound" "on most" of "at least 30 different occasions" at his residence, that he "hid methamphetamine in different kinds of containers around the pool located on the back side of the residence," and that there were "numerous cars" and a "large metal building shop" on his premises.

The DEA agent's affidavit did state, however, that law enforcement officers had flown over the residence in question and had seen a pool in the location specified, along with "numerous cars ... around the property." The DEA agent's affidavit also stated that law enforcement officers had photographed a "large metal building shop" on the premises in question. We thus reject the Hall brothers' assertions with respect to the alleged lack of corroboration for the confidential informant's information and the supposed effect of that lack of corroboration on the trustworthiness of the DEA agent's affidavit.

Finally, the motions to suppress offered assertions that the information that was provided by the confidential informant was untrue. Even if that were so, there is nothing in the record that would warrant an inference that the DEA agent knew that the information was untrue and yet deliberately or recklessly offered it to the court that issued the search warrants.

In light of the discussion above, we reject the Hall brothers' argument that the trial court abused its discretion in declining to hold a hearing on the trustworthiness of the DEA agent's affidavit. After considering the totality of the circumstances attendant to the issuance of the search warrants in this case, moreover, see, e.g., Gates, 462 U.S. at 230, 233, 238, we hold that the court that issued the warrants had a substantial basis for concluding, see id. at 236, 238, 246, that there was probable cause to believe that contraband or evidence of wrongdoing would be found at the premises in question, see

id. at 230, 236, 238, 246, <u>see</u> <u>also</u> <u>id.</u> at 227 and <u>LaMorie</u>, 100 F.3d at 552. Accordingly, we affirm the trial court's denial of the Hall brothers' motions to suppress.

IV.

Shortly before trial, Randall Hall and Roy Hall asked the trial court to order the government to disclose any medical records related to the attempted suicide of one government witness as well as any of her psychiatric records that existed before her attempted suicide. Randall Hall and Roy Hall suggested that they needed such records to prepare for cross-examination of the witness in question, specifically with regard to impeaching her credibility. Everett Hall joined in the motion on the first day of trial. The government responded that it did not possess or control any of the medical or psychiatric records for the witness. The trial court then denied the motion.

On appeal, the defendants acknowledge that the government has no obligation to obtain for a defendant records that it does not already have in its possession or control. <u>See</u>, <u>e.g.</u>, <u>United States v. Riley</u>, 657 F.2d 1377, 1386 (8th Cir. 1981); <u>see</u> <u>also</u> <u>United States v. Skorniak</u>, 59 F.3d 750, 755-56 (8th Cir. 1995), <u>cert.</u> <u>denied</u>, 516 U.S. 980 (1995). In these circumstances, we see no error by the trial court in denying the defendants' motion for medical and psychiatric records on the witness in question.

During the opening statements, Roy Hall's lawyer made several remarks about that witness. Specifically, Mr. Hall's lawyer stated that the witness had a "past history of lying," that she had "told ... law enforcement authorities a few years ago that her father had committed a sex crime against her," which prompted his being "taken in," and that she had "then recanted it." Thus, Mr. Hall's lawyer suggested, it was reasonable to believe that the witness would lie about Mr. Hall's alleged drug-related activities.

When the witness later testified, Mr. Hall's lawyer attempted to cross-examine her about the incident with her father. The government objected, contending that such

-16-

evidence was on "a wholly collateral matter."  The trial court then refused to allow Mr. Hall's lawyer to proceed with cross-examination of the witness about that incident, which had occurred 10 years previously, when the witness was 13 years old.  On appeal, Mr. Hall argues that the trial court's restriction of that cross-examination violated his rights under the confrontation clause, see U.S. Const. amend. VI.  We disagree.

The confrontation clause guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish" (emphasis in original). Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  The confrontation clause "is generally satisfied when the defense is given a full and fair opportunity to probe and expose [the] infirmities" of testimony from a witness, "thereby calling to the attention of the factfinder the reasons for giving scant weight" to that testimony.  Id. at 22; see also Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986).  A critical consideration in determining whether the defendant had such a "full and fair opportunity," Delaware v. Fensterer, 474 U.S. at 22, is whether the defendant "had other ways to obtain the effect that the excluded examination would have allegedly established." United States v. Brown, 110 F.3d 605, 611 (8th Cir. 1997).  In other words, did the defendant have "ample opportunity to discredit" the testimony of the relevant witness?  Id.

From the trial transcript, it appears that the witness in question in this case testified, at a minimum, from late morning through the end of the day and that cross-examination by the defendants accounted for well over half (and possibly as much as two-thirds) of that time.  In light  of those proportions and in light of the defendants' success in bringing out not only multiple instances of serious lying by the witness but also several substantial reasons for her to have lied in her original statements to federal drug agents, and to continue to lie at trial, about Roy Hall's alleged drug-related activities, we believe that any additional effect of cross-examination about the incident between the witness and her father would have been minimal.  We also note that the

incident between the witness and her father was not related to the events at issue in the trial and was remote in time. We therefore consider it to have been of only slight relevance at best. See, e.g., United States v. Willis, 997 F.2d 407, 416 (8th Cir. 1993), cert. denied, 510 U.S. 1050 (1994), and United States v. Crump, 934 F.2d 947, 952-53 (8th Cir. 1991).

Given these circumstances, and the marginal relevance of the incident between the witness and her father, we hold that the trial court's restriction of Roy Hall's cross-examination of the witness with respect to that incident did not violate his rights under the confrontation clause. See, e.g., United States v. Brown, 110 F.3d at 611; United States v. Willis, 997 F.2d at 415-16; and United States v. Crump, 934 F.2d at 952-53.

## V.

One of the witnesses who testified on behalf of the defendants was the oldest sister of Everett Hall and Randall Hall. She stated that she had retired in late 1994 from her position as a paralegal for the U.S. Attorney's office that was prosecuting the defendants. On both direct examination and cross-examination, she denied that she had ever used her position to obtain information for the defendants on the investigative activities of that office and also denied that she had ever taken or read a case file that was not necessary to her duties in the office.

In its rebuttal case, the government called an Assistant U.S. Attorney from that office, who testified that after noticing that a particular methamphetamine-related case file (relative to a person other than the defendants) was "missing," she found the case file on the sister's desk. The witness also testified that, to her knowledge, there was no "legitimate reason" for the sister to have that case file. The defendants subsequently moved to strike the testimony of the Assistant U.S. Attorney, contending that the government had acted in bad faith in calling her and that the testimony was not proper rebuttal. The trial court at first denied the motion, stating that "the whole issue is

somewhat collateral to the charges in this case" and that the testimony was "somewhat irrelevant."

The defendants then argued that, although collateral, the issue was "brought into the case by the government solely for the purpose of suggesting that somebody [had] done something improper ... in order to ... assist the defendants, [for] which there's been no evidence at all." The defendants further asserted that the particular case file in question "was never made available ... during ... discovery" and that "the clear inference [that] the jury is going to perhaps make ... is that [the defendants were] being assisted by" the person who was the subject of the case file in question.

The trial court commented that "there's been no inference whatsoever that [the subject of that case file] was associated in any way with ... these three defendants." In response, the defendants contended that the government had indeed made such an implication, since the government was "making an issue of the fact that the sister of ... two [of the] defendants ... ostensibly [was] performing duties contrary to the interests of the United States Attorney's office." In so doing, the defendants argued, the government was "attacking the [sister's] credibility" and was "insinuating" that the sister had "by her actions in that office done something to frustrate [the defendants'] having ever been arrested or charged while she worked there," that the defendants had been "successfully operating some kind of methamphetamine operation outside the realm of the U.S. Attorney's office because of [the] sister," and that the defendants and the subject of the case file in question were "in some type of cahoots." The defendants then moved for a mistrial. The trial court denied the motion.

To the jury, the trial court announced that it was striking all of the Assistant U.S. Attorney's testimony. The trial court then instructed the jury "to give no consideration to any of [that] testimony whatsoever," "to disregard any testimony relative to" the case file in question, and "to draw no inference whatsoever from the testimony relative to" that case file. On appeal, Randall Hall and Roy Hall assert that despite the trial court's

instructions to the jury, the Assistant U.S. Attorney's testimony "was impossible for the jury to forget" and therefore that the trial court abused its discretion in denying the motion for a mistrial. See, e.g., United States v. Maza, 93 F.3d 1390, 1397-98 (8th Cir. 1996), cert. denied, 117 S. Ct. 1008, 1345 (1997). We disagree.

During her testimony, the Assistant U.S. Attorney conceded that the case file in question was "devoid" of "sensitive information" and therefore had not been "locked up" but, instead, was kept in a cabinet in a common hallway, that the sister "probably wasn't" ever told "not to get in the files in the hallway," that it "could have happened" that the sister "picked that file up by mistake," that the case file in question contained nothing to suggest that its subject might be cooperating with the government, and that she had "no information" that the sister had "directly helped others [to] traffic in drugs." In light of these concessions, the collateral nature and minimal relevance of the testimony, the trial court's prompt instructions to the jury, and the presumption that the jury followed the trial court's instructions, we hold that the trial court did not abuse its discretion in denying the motion for a mistrial. See, e.g., United States v. Maza, 93 F.3d at 1397.

VI.

All three defendants contend that the evidence was insufficient to sustain their convictions for conspiracy to distribute methamphetamine and to possess methamphetamine with the intent to distribute it. They argue that although the evidence may have allowed the conclusion that each of them used methamphetamine, there was insufficient evidence to support the conclusion that each defendant conspired, from spring, 1993, to spring, 1995, with both of the other defendants to distribute methamphetamine or to possess large enough amounts of it to allow the inference of an intent to distribute it. They also challenge the credibility of several government witnesses who admitted to being heavy users of methamphetamine. Finally, they challenge the trial court's finding (by a preponderance of the evidence) that all three of them were in a conspiracy together at the relevant time and therefore that certain

hearsay testimony with respect to any of them could be used against both of the others. See Fed. R. Evid. 801(d)(2)(E).

Law enforcement officers testified that during a search of Everett Hall's premises in spring, 1995, officers found an electronic digital scale, two bottles of a "cutting" powder commonly used to reduce the purity level of methamphetamine, and various separate amounts of methamphetamine ranging in quantity from .66 grams to 47.3 grams and ranging in purity level from 20 percent to 91 percent, some of which was concealed inside uninstalled engine parts. Another law enforcement officer testified that during a search of Randall Hall's premises in spring, 1995, officers found an electronic digital scale, a bottle of a "cutting" powder commonly used to reduce the purity level of methamphetamine, a vial of methamphetamine with a purity level of 43 percent, and a pamphlet with instructions for making methamphetamine. An additional law enforcement officer testified that during a search of a storage building on another person's premises in spring, 1995, officers found a triple-beam scale; that other person testified that he put that scale or a similar one in his own storage building at Roy Hall's request. Another law enforcement officer, with approximately 15 years of experience in drug-related investigations, testified that a purity level of 12.5 percent was in "the high range" for methamphetamine used by individuals and that "clandestinely" manufactured methamphetamine "usually" had an initial purity level of approximately 90 percent.

A witness testifying under an immunity agreement with the government stated that Roy Hall had sold methamphetamine to her at least twice in summer and fall, 1994, and that he had instructed her on the optimal quantities for her sale of methamphetamine to others. She also testified that she had met all of the defendants in 1994, that she had seen Roy Hall acquire methamphetamine from each of the Hall brothers, that she had seen both Everett Hall and Roy Hall using a "cutting" powder to reduce the purity level of some methamphetamine, and that she had seen each of the defendants with at least a pound of methamphetamine on separate occasions in early

-21-

1995. She testified further that she had traveled with Randall Hall and Roy Hall on one occasion during the relevant period to a trailer where methamphetamine was being made and that of the three pounds of methamphetamine that was acquired there, Everett Hall and Roy Hall took a half-pound each and Randall Hall kept two pounds.

That witness also testified that she used up to two grams of methamphetamine a day during the relevant period. A second witness testifying under an immunity agreement with the government stated that a reasonable amount of methamphetamine to keep on hand for personal use was approximately three and a half grams (roughly one-eighth of an ounce) and that she used up to a gram of methamphetamine a day during the relevant period.

A third witness testifying under an immunity agreement with the government stated that she was "a participant" in an agreement to distribute methamphetamine with both Hall brothers in spring and summer, 1993. A fourth witness testifying under an immunity agreement with the government stated that each of the Hall brothers had sold methamphetamine to her in either 1993 or 1994. A fifth witness testifying under an immunity agreement with the government stated that Roy Hall had given him methamphetamine about 15 times in late 1994 or early 1995 in exchange for certain services, that he had seen Mr. Hall with as much as a pound of methamphetamine on one occasion during that time, that he had seen a triple-beam scale in Mr. Hall's kitchen, and that he had helped Mr. Hall transfer several items into the storage building on the premises where law enforcement officers later found a triple-beam scale.

We believe that the evidence is sufficient to support the defendants' convictions. The first witness with an immunity agreement stated that she met the defendants in 1994 and specified one occasion between late 1994 and spring, 1995, when she accompanied two of the defendants to a trailer where methamphetamine was being made, stated that those two defendants acquired at least three pounds of methamphetamine there, and further stated that the three defendants divided up the

three pounds of methamphetamine acquired there. The smallest quantity that any defendant took from that three pounds was a half-pound, which, according to the testimony of two witnesses, is far more than a personal use amount, regardless of purity level. Several witnesses testified that they had personally bought methamphetamine from, had witnessed sales of methamphetamine by, or had seen methamphetamine being "cut" by various combinations of the three defendants during the relevant period.

The high purity levels of the methamphetamine found on the premises of two of the defendants in spring, 1995, easily support the conclusion that the methamphetamine that was possessed by each of the three defendants was intended for eventual further distribution. Also supporting that proposition are the scales associated with each of the three defendants and the bottles of a "cutting" powder on the premises of two of the defendants. We therefore reject the defendants' challenge to the sufficiency of the evidence on conspiracy, noting in addition that it is not our province to revisit the jury's apparent assessments of the credibility of certain witnesses. In light of our conclusions in that regard, we need not address the defendants' challenge to the trial court's preliminary finding that a conspiracy existed.

VII.

In a somewhat related vein, Randall Hall contends that the evidence showed more than one conspiracy and thus that the trial court erred in declining to instruct the jury on multiple conspiracies. Whether there was sufficient evidence " 'to sustain ... a multiple conspiracy instruction is generally a question of law subject to de novo review.' " United States v. Maza, 93 F.3d at 1398, quoting United States v. Jackson, 67 F.3d 1359, 1367 (8th Cir. 1995), cert. denied, 517 U.S. 1192 (1996); see also United States v. Delpit, 94 F.3d 1134, 1148 (8th Cir. 1996). Mr. Hall's arguments on appeal actually conflate two different difficulties with respect to this question.

The first is the danger that a jury will convict a defendant because of a conspiracy in which the defendant did participate but that was not the one charged in

-23-

the indictment. See, e.g., 8th Circuit Model Criminal Instruction 5.06G(3), at 149, and note 2 on use, at 152 (1996). With respect to that difficulty, Mr. Hall asserts that the relevant testimony is that of the third witness with an immunity agreement, who stated that she participated in a methamphetamine-related conspiracy with the Hall brothers in 1993. Randall Hall contends that the jury might have convicted him solely on the basis of that conspiracy rather than on the basis of the conspiracy of longer duration -- between 1993 and 1995 -- that was charged in the indictment.

Mr. Hall's proposed instruction addressed this difficulty by stating that if the government had failed to prove that a defendant "was a member of the conspiracy which is charged," then the jury had to acquit that defendant "even though he may have been a member of some other conspiracy." We note, however, that the trial court's instruction on the elements of conspiracy required, for conviction of any defendant, both a finding that "the defendant ... joined in the conspiracy" "as charged in [the relevant count] of the indictment" and a finding that the elements with respect to that conspiracy were proved "as to that defendant."

We believe that the instructions that the trial court gave "fairly and adequately contained the applicable law ... and covered the essence" of Mr. Hall's proposed instruction, United States v. Cain, 128 F.3d 1249, 1252 (8th Cir. 1997). We therefore reject Mr. Hall's contention that the trial court erred in declining his proposed instruction because of the danger that the jury would convict him for a conspiracy in which he participated but that was not the one charged in the indictment.

The second difficulty that we consider is the danger that a jury will convict a defendant because of that defendant's association with a co-defendant who participated in a conspiracy other than the one charged in the indictment and in which the defendant did not participate. See, e.g., 8th Circuit Model Criminal Instructions 3.07, ¶ 3, at 72, and 3.09, ¶ 2, at 76, and note 4 on use, ¶ 5, at 78, and 5.06B, ¶ 3, ¶ 5, at 140, and 5.06G(2), at 149, and note 3 on use, at 152 (1996); see also 8th Circuit Model Criminal

Instruction 6.21.846, committee comments, ¶ 1, at 397 (1996). In this respect, Mr. Hall refers to his association with Roy Hall, who, Randall Hall argues, participated in at least two conspiracies other than the one charged in the indictment and in neither of which, Randall Hall argues, he himself participated.

As to the first of those other conspiracies, Mr. Hall asserts that the relevant evidence is the testimony of the fifth witness with an immunity agreement. That witness stated that he was present when Roy Hall sold or gave methamphetamine to a friend of the witness in mid-1994 (the first witness with an immunity agreement testified to the same effect about that occasion, the friend, and Roy Hall). As to the second of those other conspiracies, Randall Hall asserts that the relevant evidence is the testimony of the first witness with an immunity agreement. She stated that Roy Hall (and she) bought methamphetamine in early 1995 from another friend.

Although Randall Hall characterizes the second difficulty at issue here as the trial court's failure to instruct on multiple conspiracies, the courts have characterized the structure and content of his arguments as a question of potentially prejudicial variance between the indictment and the proof at trial. (Indeed, two of the three cases that Mr. Hall cites in this regard are actually concerned not with a failure to instruct the jury about multiple conspiracies but, instead, with whether the defendant suffered prejudice to substantial rights because of a variance between the indictment and the proof.) Assuming, however, that the evidence showed the participation of Roy Hall in three conspiracies, and that such circumstances would constitute a variance between the indictment and the proof with respect to Randall Hall, we still do not believe that Mr. Hall is entitled to a reversal of his conviction.

A variance between the indictment and the proof justifies the reversal of a defendant's conviction "only when a 'spillover' of evidence from one conspiracy to another has prejudiced [the] defendant's substantial rights." United States v. Morales, 113 F.3d 116, 119 (8th Cir. 1997). In our view, this case was not a particularly

-25-

"complex" one or one dealing with "complicated or confusing" transactions, id. at 119-20, and we see "no likelihood" that the jury convicted Randall Hall because of the evidence relating to the two allegedly separate conspiracies in which Roy Hall was the only defendant involved, United States v. Jagim, 978 F.2d 1032, 1041 (8th Cir. 1992), cert. denied, 508 U.S. 952 (1993). We observe as well that the trial court instructed the jury that "merely being present ... or merely associating with others" is not sufficient to prove that "a person has joined" in a conspiracy. Accordingly, we reject Randall Hall's assertion that any alleged variance prejudiced his substantial rights. See, e.g., Berger v. United States, 295 U.S. 78, 82-84 (1935); United States v. Morales, 113 F.3d at 119-20; and United States v. Jagim, 978 F.2d at 1041. Cf. Kotteakos v. United States, 328 U.S. 750, 752, 758, 765-66, 769 n.24, 772-73 (1946) (evidence of eight separate conspiracies involving 32 defendants and four unindicted other persons).

VIII.

As noted above, Everett Hall was charged with one count of possession of an unregistered silencer. Mr. Hall contends that the jury instruction on that count was deficient because of its omission of certain alleged elements of the charge, specifically, knowledge that a silencer is a "firearm" under the law and knowledge that the relevant item in this case could in fact function to diminish the sound of a gun.

Mr. Hall's first contention, as we understand it, is that the relevant jury instruction did not require a finding that he knew that the possession of a silencer was illegal. The Supreme Court has held many times that this kind of scienter, which has come to be called "specific intent," is not an implied element of most criminal offenses. See, e.g., United States v. Freed, 401 U.S. 601, 607-10 (1971); cf. Rogers v. United States, 118 S. Ct. 673, 676 (1998) (plurality opinion). Since the statute does not on its face require that Mr. Hall know that his possession of a silencer was illegal, and since he points us to no authority that would take the case out of the general rule that this sort of scienter must be implied, we reject his contention that the instruction in question was objectionable in this respect.

-26-

We do agree with Mr. Hall, however, that a jury instruction on the elements of the crime charged here must require a finding that the defendant knew that the relevant item could in fact function to diminish the sound of a gun. See, e.g., Rogers, 118 S. Ct. at 676-77, 677 n.7 (plurality opinion), and United States v. Thompson, 82 F.3d 849, 854 (9th Cir. 1996) (when charges are derived from the statute at issue here, jury instruction on elements must require a finding that defendant knew that "what he possessed was a silencer"); see also Staples v. United States, 511 U.S. 600, 619 (1994) (when charges are derived from the statute at issue here, government must prove that defendant "knew of the features" of the item in question "that brought it within the scope" of the statute).

The relevant jury instruction in this case required a finding that the defendant knew that he possessed a firearm, a finding that the firearm was a silencer, a finding that the firearm was "capable of operating as designed," and a finding that the firearm was not registered to the defendant. The instruction, it is true, is not ideally suited to cases in which a silencer is the item considered to be the "firearm." Nonetheless, in our view, the only reasonable interpretation of the instruction is that it required a finding that the defendant knew that the relevant item was "a device having all the characteristics of a silencer," Rogers, 118 S. Ct. at 677 n.7 (plurality opinion), i.e., knew that the item could function to diminish the sound of a gun, see 18 U.S.C. § 921(a)(3)(C), § 921(a)(24).

We reach that conclusion for two reasons. First, the instruction required a finding that the firearm relevant to the pertinent count of the indictment was a "silencer," and, in this case at least, we see no reasonable interpretation that the jury could make of the word "silencer" other than as a synonym for the type of attachment to a gun that functions to diminish the sound of that gun and thus, both the government and Mr. Hall agree, is prohibited by the statute that is the basis for the crime charged in the relevant count. Second, the instruction also required both a finding that the defendant knew that he possessed a firearm and a finding that "the" firearm was a

-27-

"silencer," and we see no reasonable interpretation of those requirements collectively other than that the defendant knew that he possessed an item that could in fact function to diminish the sound of a gun. We therefore reject Mr. Hall's contention with respect to the adequacy of the instruction's description of the elements of the crime charged here.

Mr. Hall also argues that the evidence was insufficient to sustain his conviction for possession of a silencer that was not registered. He asserts that no evidence connected him to the item in question (i.e., that no evidence showed that he knew that he possessed the item that the government contended was a silencer) and, in addition, that no evidence showed that he knew that the item could actually function as a silencer. We disagree.

Law enforcement officers testified that during a search of Mr. Hall's premises in spring, 1995, officers found a gun in a gym bag that was concealed behind a wall panel. A witness testifying under an immunity agreement with the government stated that she had seen Mr. Hall with that gun, engaged in what she "believe[d]" to be "target practice." An officer further testified that the design of the gun allowed an additional barrel to be attached and that the gym bag contained three such additional barrels, one of which was the item that the government contended was the silencer that Mr. Hall possessed. That item was easily attached to the gun. An officer stated that tests on that item revealed that it reduced the sound of the gun approximately tenfold.

Law enforcement officers testified as well that the gym bag also held a smaller nylon bag, which itself contained some twine and a plastic bag with rivets in it. Two officers testified that twine and rivets can be used to enhance the muffling capabilities of a silencer on a gun. Also inside the nylon bag, officers stated, was a black bag containing three pieces of steel wool, each twisted into a circle with a hole in the middle. Two officers testified that such steel wool pieces can be used to enhance the muffling capabilities of a silencer on a gun.

-28-

We believe that the testimony of the law enforcement officers who found the item in question on Mr. Hall's premises, in conjunction with the testimony of the witness with an immunity agreement that she had seen Mr. Hall with the gun to which the item was easily attached, is more than sufficient to support a finding beyond a reasonable doubt that Mr. Hall was connected to that item (i.e., that he knew that he possessed it). We also believe that the officer's testimony about the tests on that item is sufficient to support a finding that the item could actually function as a silencer.

With respect to whether Mr. Hall knew that the item in question could actually function as a silencer, we note that "knowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the [relevant item]." Staples, 511 U.S. at 615-16 n.11. According to the testimony of law enforcement officers, the item in question was found concealed behind a wall panel. Further testimony revealed that the item was in the same gym bag as a gun to which the item could easily be attached, some twine, some rivets, and some pieces of twisted steel wool. All three of those latter materials, officers testified, can be used to enhance the muffling capabilities of a silencer on a gun. In our view, the collective content of that evidence is sufficient, first, to create a reasonable inference that Mr. Hall knew that the item in question could actually function as a silencer and, second, to support a finding to that effect beyond a reasonable doubt. We therefore reject Mr. Hall's challenge to the sufficiency of the evidence on the charge that he possessed a silencer that was not registered.

IX.

All three defendants object to the fact that the judge who presided over their trial recused himself sua sponte from the sentencing proceedings and thus that the judge who sentenced them had not presided over their trial. We see no error in this respect.

Fed. R. Crim. P. 25(b) provides that if "by reason of absence ... or other disability the judge before whom [a] defendant has been tried is unable to perform the

duties to be performed by the court after a verdict ... of guilt[y], any other judge ... assigned to the court may perform those duties."  This rule applies where, as here, the trial judge recuses himself or herself from the sentencing proceedings.  See, e.g., Bennett v. United States, 285 F.2d 567, 572 (5th Cir. 1960), cert. denied, 366 U.S. 911 (1961).  The record reveals no abuse of discretion, moreover, in the trial judge's decision to recuse himself from the sentencing proceedings in this case.  Cf. In re Federal Skywalk Cases, 680 F.2d 1175, 1183-84 (8th Cir. 1982), and In the Matter of Horton, 621 F.2d 968, 970 (9th Cir. 1980) (both cases reviewing a decision not to recuse).

The defendants variously challenge three aspects of the sentencing proceedings. First, Randall Hall contends that, with respect to his sentence, the court clearly erred in its finding that he possessed a gun in connection with a drug offense and was thus subject to a two-level enhancement under the federal guidelines, see U.S.S.G. § 2D1.1(b)(1).

As the government points out, however, law enforcement officers found a loaded gun and additional appropriate ammunition in a closet in Mr. Hall's bedroom during a search of his premises.  Since the guidelines provide that the enhancement "reflects the increased danger of violence when drug traffickers possess weapons" and is therefore to be applied "unless it is clearly improbable that the weapon was connected with the offense," see U.S.S.G. § 2D1.1 application note 3, we hold that the court's finding in this respect was not clearly erroneous.  See, e.g., United States v. Darden, 70 F.3d 1507, 1547 (8th Cir. 1995), cert. denied, 517 U.S. 1149, 518 U.S. 1026 (1996).

Second, Randall Hall and Roy Hall argue that the government made an insufficient showing with respect to the type of methamphetamine to be attributed to them for sentencing purposes.  See, e.g., United States v. Ortega, 150 F.3d 937, 944 (8th Cir. 1998).  They assert, therefore, that the court clearly erred in its finding that the relevant methamphetamine was d-methamphetamine rather than l-methamphetamine.

The applicable guidelines for sentencing in this case were those in effect between November, 1994, and November, 1995. See U.S.S.G. § 1B1.11(b)(1). Those guidelines distinguished between two types of methamphetamine and imposed harsher penalties if the  methamphetamine  considered for sentencing purposes in a case was d-methamphetamine instead of l-methamphetamine.  See U.S.S.G. § 2D1.1(a)(3), § 2D1.1(c), and § 2D1.1 application note 10 (Nov. 1994); see also United States v. Maggard, 156 F.3d 843, 849 (8th Cir. 1998), and United States v. Jacobs, 136 F.3d 1187, 1189 (8th Cir. 1998).

At trial, a forensic chemist testified that he tested 11 samples of methamphetamine that law enforcement officers found on the premises of Everett Hall and Randall Hall.  The chemist stated that all of those samples were d-methamphetamine.  Nothing in the record suggests that any l-methamphetamine was involved in this case or, indeed, that any of the methamphetamine in this case caused effects other than the stimulating ones characteristic of d-methamphetamine (and unlikely with l-methamphetamine), see, e.g., United States v. Loveless, 139 F.3d 587, 591, 593 (8th Cir. 1998).

In such circumstances, a sentencing court is permitted to infer that all of the methamphetamine was of the same type as the samples tested.  See, e.g., United States v. Behler, 100 F.3d 632, 636 (8th Cir. 1996), cert. denied, 118 S. Ct. 152 (1997).  We therefore hold that it was not clearly erroneous for the court in this case to find that all of the methamphetamine relevant for sentencing purposes was d-methamphetamine. See, e.g., United States v. Loveless, 139 F.3d at 583, and United States v. Behler, 100 F.3d at 636.

Finally, all three defendants assert that, in determining the amount of methamphetamine to be attributed to them for sentencing purposes (one to three kilograms), the court consulted only certain selected pages of the trial transcript and thus could not assess accurately the appropriate quantity of that methamphetamine.

The defendants also contend that because the credibility of the witnesses who testified to methamphetamine amounts was so critical to a proper assessment of that quantity, because the court did not observe the testimony of those witnesses at trial, and because the reliability of that testimony was so inherently suspect given the untrustworthiness of those witnesses due to their own drug addictions and incentives to lie, the court should not have drawn its conclusions from the trial transcript with regard to methamphetamine quantity but instead should have held an evidentiary hearing before determining that quantity.

In cases where the sentencing judge did not preside over the trial, he or she "must be familiar enough with the case to be able to assign [an] appropriate sentence." United States v. Larios, 640 F.2d 938, 942 (9th Cir. 1981). "While what is necessary varies with the facts of each case, the more the case depends on the credibility, and especially the demeanor, of the witnesses, the more a judge needs to do to become adequately familiar with it." Id. at 943.

The sentencing court in this case stated at all three sentencing hearings that it had read the relevant defendant's presentence report more than once and had reviewed all of the trial transcript citations that were provided by the defendants (and the government). None of the defendants suggested, either in objections to the presentence report or during the sentencing hearings, that the court had to read the entire trial transcript, or even the entire testimony of the relevant witnesses, in order to evaluate the credibility of those witnesses with respect to the appropriate methamphetamine amount to be used for sentencing purposes. Indeed, many of the page citations offered by the defendants were apparently included specifically to challenge the credibility of those witnesses.

The only remarks even close to a suggestion that the court should read more than the page citations offered by the defendants came at the very beginning of Everett Hall's sentencing hearing, when his lawyer asked the court to "certify that it has, in fact, read

-32-

the transcripts in this case and [has] become familiar with the testimony contained therein." Those comments, however, were in the context of the discussion with respect to whether it was proper for the sentencing judge, rather than the trial judge, to preside at the sentencing hearings. When Mr. Hall's lawyer began to object specifically to the methamphetamine amount that the government proposed for sentencing purposes, the lawyer referred solely to the page citations offered in Mr. Hall's objections to the presentence report. We consider it disingenuous, moreover, for the defendants to object on appeal to the court's approach to determining the appropriate amount of methamphetamine for sentencing purposes when that court consulted all of the trial transcript citations that the defendants offered at the time. We note as well that the defendants do not challenge the court's attribution to each of them of relevant amounts for the other two defendants. See U.S.S.G. § 1B1.3(a)(1)(B) and application note 2, application note 9. We therefore reject the defendants' contentions regarding the necessity for an evidentiary hearing in connection with the imposition of their sentences.

We have consulted those portions of the trial transcript cited by the government and the defendants. Even using the most conservative estimates of methamphetamine quantities associated with each defendant, and disregarding testimony that was ambiguous or incomplete with respect to dates, quantities, and actual possession or transfer by the defendants or that could have led to counting some quantities more than once, we find more than enough evidence to support the court's determination that the relevant amount of methamphetamine for sentencing purposes in this case was one to three kilograms. That determination, in other words, was not clearly erroneous. See, e.g., United States v. Ayers, 138 F.3d 360, 363 (8th Cir. 1998), cert. denied, 119 S. Ct. 219 (1998).

X.

For the reasons stated, we affirm the defendants' convictions and their sentences.

OWEN M. PANNER, District Judge, concurring in part and concurring in the judgment.

Everett Hall's conviction for possession of an unregistered silencer can be sustained under the Commerce Clause. It is difficult to conceive of any legitimate purpose for which a private citizen needs a silencer. Congress could reasonably conclude that silencers should be strictly regulated or prohibited outright.

Although there was no proof that the silencer possessed by Hall traveled in interstate commerce, the power to outlaw the manufacture or possession of silencers is ancillary to the power to prohibit trafficking in silencers. Generally speaking, the Constitution delegates to the federal government those tasks that individual states could not accomplish acting alone, or where uniformity or interstate cooperation is required. Congress could properly conclude that a uniform standard and regulatory scheme are needed to manage firearms, silencers, and similar dangerous devices, which are readily transportable.

The instant case is distinguishable from *United States v. Lopez*, 514 U.S. 549 (1995), because the federal government has prohibited the manufacture, distribution, or possession of silencers by private citizens unless permission has first been obtained from the Department of Alcohol, Tobacco, and Firearms, and the device has been registered to that person. 26 U.S.C. §§ 5812, 5822, 5841, 5861, 5871. By contrast, in *Lopez* it was not unlawful for the defendant to possess the gun, but only to do so near a school.

Because Hall's conviction can be sustained under the Commerce Clause, I do not reach the question of whether that conviction might also be sustained under the Taxation Clause.

With that single exception, I concur in Judge Arnold's well-reasoned opinion. I also concur in the judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.