UNITED STATES of America, Appellee,

v.

William E. DODGE, aka Mr. Bill; Edmund S. Borkoski, aka Borkoski S. Edward, aka Ed, aka Edward Borkoski, Defendants–Appellants.

Nos. 1052, 1715,
Dockets 94–1459, 94–1553.

United States Court of Appeals,
Second Circuit.

Argued May 1, 1995.

Decided July 25, 1995.

Thomas G. Dennis, Hartford, CT (Federal Public Defender for D. Conn.), for defendant-appellant William E. Dodge.

Joseph B. Burns, Hartford, CT (Austin J. McGuigan, Rome, McGuigan, Hoberman, Sabanosh & Klebanoff, Hartford, CT, of counsel), for defendant-appellant Edmund S. Borkoski.

Before: OAKES, WINTER, and MINER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant William Dodge appeals from a judgment of conviction and sentence entered in the United States District Court for the District of Connecticut (Daly, J.), following his plea of guilty to possessing the components of an unregistered destructive device, in violation of 26 U.S.C. § 5861(d). Defendant-appellant Edmund Borkoski appeals from a judgment of conviction and sentence entered in the same court following a jury trial, having been convicted of conspiracy to possess an unregistered firearm, in violation of 18 U.S.C. § 371. The district court previously had denied defendants' motion to dismiss the indictment for failure to charge an offense. The court sentenced Dodge principally to 63 months in prison and Borkoski principally to 54 months in prison. For the reasons that follow, we affirm the judgments of the district court.

## BACKGROUND

In the early spring of 1993, the Connecticut State Police and local law enforcement authorities in the Wallingford, Connecticut area initiated an investigation into the local Ku Klux Klan ("KKK"). After receiving information that members of the KKK had violated federal firearms laws, local law enforcement officials called in the Bureau of Alcohol, Tobacco & Firearms ("ATF") to assist in the investigation. The state police developed a confidential informant named Brian Waldron, who became associated with the "Grand Dragon" of the regional KKK, William Dodge, and members of Dodge's "inner circle." Between August and October of 1993, Waldron was approached by members

Christopher F. Droney, U.S. Atty., D. Conn. (Anthony E. Kaplan, Asst. U.S. Atty., New Haven, CT, of counsel), for appellee.

of the KKK who sought to obtain explosives and conversion kits for firearms. Waldron was instructed to tell the KKK members that he might be able to accommodate them through a source in Massachusetts.

In a recorded conversation, Waldron conveyed his plans to obtain explosives and firearms for other members of the KKK to Dodge. At that point, Dodge asked Waldron to acquire explosives for him. The two agreed to meet again to discuss the deal. On December 8, 1993, Waldron met with Dodge and defendant Borkoski at Dodge's home, where Waldron provided the two men with a list of illegal firearms, silencers and explosives. Borkoski ordered a .25 caliber handgun with a silencer. Dodge said he wanted five pipe bombs and an automatic weapon. Dodge also inquired about a timer for the pipe bombs. When Waldron told him that his source could put a timer on the bomb that would delay detonation for up to two hours, Dodge replied: "Oh man that's perfect. All I need is forty five minutes."

Waldron met with Dodge on several occasions and discussed the bombs as well as the pistol and silencer that Borkoski had ordered. On January 9, 1994, Waldron met with Dodge and others at Dodge's home for the weekly meeting of the inner circle. At one point, Dodge spoke with Waldron alone about the pipe bomb. Dodge told Waldron that he wanted to purchase a pipe bomb with a timer, because, with a timer "[y]ou can have your alibi all set up." Waldron also recorded several statements by Dodge, set out in the margin, indicating that Dodge intended to blow up a structure with the bomb and needed a timer to establish an alibi.[1]

Over the next few days, Waldron, Dodge and Borkoski worked out the details of their transaction. On January 15, 1994, Dodge gave Waldron $100 for the pipe bomb that he had ordered and $150 for the pistol with silencer that Borkoski had ordered. On January 21, 1994, Waldron and an undercover ATF agent met Dodge in front of his residence and gave him a bag containing a gun, a silencer, and components for a pipe bomb. A short time later, law enforcement authorities executed a search warrant at Dodge's house, arrested Dodge, and recovered the gun, silencer and components for the bomb. Borkoski was arrested shortly thereafter.

Both defendants were charged under the National Firearms Act ("NFA"), codified at 26 U.S.C. § 5801 et seq., with conspiracy to possess an unregistered firearm, in violation of 18 U.S.C. § 371, and Dodge was charged with possessing an unregistered silencer and an unregistered destructive device, in violation of 26 U.S.C. § 5861(d). Dodge and Borkoski moved to dismiss the charges on the ground that, because the government is ex-

---

1. Dodge made the following statements regarding his intended purpose for the pipe bomb:

WD [William Dodge]: Well how big is it gonna be? I want something that'll at least go through a wall.
. . . .
WD: (inaudible) Well it should take out a wall or something, you know.
. . . .
WD: (inaudible) take out like five, six feet (inaudible) of this . . . wall and ten feet, twelve feet (inaudible) . . . or maybe on on [sic] the roof.
Dodge later explained:
WD: Well I'll take one for now, (inaudible) . . . tell him to make a good size one though (inaudible).
BW [Brian Waldron]: Alright. Ya need it, for a wall? So you don't want magnets on it. You wanna timer?
WD: Yeah. It's gotta be timed ah.
. . . .

WD: See it depends, ya know according to the situation.
. . . .
WD: If you gonna, I mean ya might wanna (inaudible) [t]he side of a wall on the outside of a wall (inaudible)[.]
BW: Unless you put like a box over it ya know what I'm sayin. Put it in a bag. . . .
WD: Course if it's on your roof it might cause more damage (inaudible) . . . and get a big fire going.
WD: (inaudible) yell, here's something in the papers ya know.
BW: I can see my beeper goin[g] off now, when we going on vacation (laughs).
. . . .
WD: How long will the timer go up to?
BW: He [Waldron's source] can make it an hour.
WD: Couple hours?
BW: An hour, two hours. He doesn't recommend anything more than two hours.

empt from paying the transfer tax under the NFA, enforcement of the registration requirements was unconstitutional in this case. The district court denied the motion, having determined that, under the NFA, it is unlawful for a transferee to accept possession of unregistered firearms, *see* 26 U.S.C. §§ 5812(b) and 5861(b) and (d), and that the regulatory scheme was a valid exercise of Congress' taxing power, *see* U.S. Const. art. I, § 8.

Dodge subsequently pleaded guilty to one count of possessing an unregistered destructive device, but reserved the right to appeal the denial of his motion to dismiss the indictment. At sentencing, Dodge disputed the government's assertion that he possessed the bomb with the intent to commit another felony and therefore was subject to a four-level enhancement under U.S.S.G. § 2K2.1(b)(5). After hearing the parties' arguments, the district court found that the enhancement under section 2K2.1(b)(5) was appropriate because Dodge possessed the bomb "with the knowledge, intent, and reason to believe that it would be used or possessed in connection with another felony offense." The court stated that its finding was based upon "the taped conversations between the Defendant and the confidential informant." The court concluded that "the taped conversations unequivocally ... demonstrate that the Defendant ... desired a device that could blow through a wall or a roof and start a fire. A device with a delayed timer to allow for the creation of an alibi." The court then sentenced Dodge principally to 63 months in prison. Defendant Borkoski was found guilty, following a jury trial, of conspiring to possess an unregistered firearm. The court sentenced him principally to 54 months in prison.

## DISCUSSION

### I. The National Firearms Act Claim

Dodge and Borkoski contend that the NFA is a taxing measure that may only be invoked to the extent that it aids in the collection of taxes. *See Sonzinsky v. United States,* 300 U.S. 506, 513–14, 57 S.Ct. 554, 555–56, 81 L.Ed. 772 (1937) (holding that registration requirements that aid in the collection of taxes are valid exercise of Congress' power to tax). Since the government is exempt from paying a tax when it transfers firearms, defendants claim that the application of the statute in this case is unconstitutional because it does not aid in the collection of taxes. We disagree.

■ Congress' authority to legislate is limited to those powers enumerated in the Constitution. *See United States v. Lopez,* ⸺ U.S. ⸺, ⸺, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995). Congress enacted the NFA pursuant to its enumerated taxing power. *See* U.S. Const. art. I, § 8; *Sonzinsky,* 300 U.S. at 513–14, 57 S.Ct. at 555–56. Of course, tax legislation may have a regulatory effect on the activity or commodity being taxed, but such effect will not invalidate the law as long as the statutory scheme is "in aid of a revenue purpose." *Sonzinsky,* 300 U.S. at 513, 57 S.Ct. at 555. Thus, the issue in this case is whether the provisions of the NFA that require the transfer of firearms to be recorded even when no taxes will result from that particular transfer are "rationally designed to aid in the collection of taxes." *United States v. Aiken,* 974 F.2d 446, 449 (4th Cir.1992). We believe that, under the circumstances of this case, the application of the registration requirement bears a sufficient nexus to the overall taxing scheme of the NFA and, therefore, assists the government in collecting revenues.

■ The NFA established a regulatory structure for the taxation of certain classes of firearms. *See* 26 U.S.C. § 5801 *et seq.; see also Haynes v. United States,* 390 U.S. 85, 87, 88 S.Ct. 722, 725, 19 L.Ed.2d 923 (1968). Section 5861(d) of Title 26 provides:

> It shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record [hereinafter "NFRTR"].

The NFRTR is a central registry for "all firearms in the United States which are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a). The term "firearms" is limited to certain types of weapons, including machine-guns, sawed-off shotguns and rifles, silencers, and dangerous

destructive devices such as bombs. *See id.* § 5845(a)-(f).

In order to effect a valid transfer of a firearm for registry in the NFRTR, the NFA requires that the transferor and the transferee meet certain obligations set forth in the statute and regulations, *see, e.g., id.* § 5841; 27 C.F.R. § 179.84–85. Specifically, the transferor is responsible for paying the transfer tax, *see* 27 C.F.R. § 179.82, and must file an application for transfer with the Director of the Bureau of Alcohol, Tobacco and Firearms ("Director"). The applicant must furnish information that identifies the transferor, transferee, and the firearm being transferred, *id.* § 179.84. Even in the case of a tax-exempt transfer, the transferor must file an application with the Director. *See id.* §§ 179.89–90. Moreover, each transferee must provide fingerprints and a photograph to the transferor and must provide a certificate from the local chief of police or other designated law enforcement officer attesting that the fingerprints are the transferee's. *See id.* § 179.85. Finally, both the statute and the regulations clearly indicate that, until notice of approval is issued by the Director, the transferee "shall not take possession of the firearm." 26 U.S.C. § 5812(b); 27 C.F.R. § 179.86.

It is obvious that defendants failed to comply with the pertinent regulations. They argue, however, that because this case involves a tax-exempt transfer of firearms, the NFA's regulatory scheme does not further a revenue purpose in this case and thus cannot be enforced. We believe that this contention relies upon far too narrow a view of the purpose of the registration requirements. The registration of the transfer of firearms when there is no tax immediately due assists the government in the collection of taxes by creating a record to track the firearms from one party to another and aids in the collection of taxes arising from subsequent, non-exempt transfers. If we accepted defendants' contention that registration was not required in this case, the government would be unable to monitor later sales of firearms that it transfers to private individuals. This would thwart the legitimate purpose of the NFA—to tax the transfer of firearms. Accordingly, because the registration require-

ments assist the government in collecting taxes on subsequent transfers, they are valid even though no revenues are produced in the original transfer. *Cf. United States v. Ridlehuber,* 11 F.3d 516, 526–27 (5th Cir.1993) (requiring a transferee to refuse to accept an unregistered firearm aids in the collection of taxes).

## II. Dodge's Sentencing Claim

■ Dodge contends that the district court improperly imposed a four-level enhancement under U.S.S.G. § 2K2.1(b)(5) because the court's finding that Dodge possessed the firearm "with the knowledge, intent, and reason to believe that it would be used or possessed in connection with another felony offense" was clearly erroneous. This contention is without merit. Section 2K2.1(b)(5) provides a four-level enhancement if the court finds, by a preponderance of the evidence, *see United States v. Castillo,* 14 F.3d 802, 807 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994), that the defendant "possessed . . . any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." Section 2K2.1(b)(5) does not require knowledge of the specific offense to be committed, *see United States v. Cutler,* 36 F.3d 406, 408 (4th Cir.1994), nor does it require that the defendant be convicted of another felony offense, *see* U.S.S.G. § 2K2.1 application note 7; *United States v. Condren,* 18 F.3d 1190, 1194 n. 11 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 161, 130 L.Ed.2d 99 (1994). We review the district court's factual findings for clear error. *See United States v. Sellers,* 42 F.3d 116, 118 (2d Cir.1994), *petition for cert. filed,* No. 94–9055 (April 28, 1995).

Here, the district court relied on the taped conversations in which Dodge stated: "I want something that'll at least go through a wall" and that the bomb should "take out like five, six feet . . . of this . . . wall and ten feet, twelve feet . . . or maybe on . . . the roof." He further stated: "It's gotta be timed" and "[c]ourse if it's on your roof it might cause more damage . . . and get a big fire going." In connection with sentencing, the district

court was presented with Dodge's explanation of his plans for the bomb—to detonate it in the woods for fun—and was entitled to reject that explanation and credit the other evidence of his purpose in acquiring the bomb. Accordingly, there was ample evidence in the record to support the district court's finding, and we cannot say that such finding was clearly erroneous.

## CONCLUSION

For the foregoing reasons, the judgments of the district court are affirmed.