**UNITED STATES of America,**

v.

**Edmund S. BORKOSKI.**

**No. CIV.3:97CV242(JBA),
CRIM.3:94CR18(TFGD).**

United States District Court,
D. Connecticut.

May 22, 2001.

Edmund S. Borkoski, Loretto, PA, pro se.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

Petitioner Edmund S. Borkoski ("Borkoski" or "petitioner") moves to vacate his sentence under 28 U.S.C. § 2255, arguing that the Government either knew or

should have known that its "star witness" gave perjurious testimony regarding a particular telephone conversation implicating the petitioner, and that his trial counsel provided ineffective assistance of counsel when he failed to explore this area of testimony sufficiently. For the reasons that follow, the motion is DENIED.

## Procedural Background

■ Petitioner and his alleged co-conspirator, William Dodge ("Dodge") were indicted in a three-count superseding indictment on March 22, 1994. The first count of the indictment charged Borkoski and Dodge with conspiring to possess an unregistered firearm in violation of 18 U.S.C. § 371; the second and third counts charged Dodge alone with knowingly possessing an unregistered silencer and a destructive device. Attorney John D. Maxwell was appointed to represent petitioner, and after a three-day trial presided over by the late Hon. T.F. Gilroy Daly in June of 1994, the jury found Borkoski guilty on count one of the superseding indictment, the sole count on which he was charged. On September 9, 1994 Judge Daly sentenced Borkoski to a term of 54 months imprisonment and three years supervised release. On direct appeal, petitioner's appellate counsel—Joseph Bree Burns, Esq. and Austin J. McGuigan, Esq.—challenged Judge Daly's refusal to dismiss the indictment for failure to charge an offense, arguing that the application of the statute requiring registration of firearms was unconstitutional in the circumstances of his case because it did not aid in the collection of taxes. *See United States v. Dodge, et al.*, 61 F.3d 142, 145 (2d Cir.1995). The conviction was affirmed by the Second Circuit, *see id.*, and Mr. Borkoski's petition for certiorari was denied by the United States Supreme court on November 27, 1995. *Borkoski v. U.S.*, 516 U.S. 1000, 116 S.Ct. 542, 133 L.Ed.2d 446 (1995). Mr. Borkoski filed this habeas petition on February 2, 1997, and in response to an Order to Show Cause the Government responded on April 4, 1997.[1]

## Factual Background

The Second Circuit decision contains the following recitation of the pertinent background facts:

> In the early spring of 1993, the Connecticut State Police and local law enforcement authorities in the Wallingford, Connecticut area initiated an investigation into the local Ku Klux Klan ("KKK"). After receiving information that members of the KKK had violated federal firearms laws, local law enforcement officials called in the Bureau of Alcohol, Tobacco & Firearms ("ATF") to assist in the investigation. The state police developed a confidential informant named Brian Waldron, who became associated with the "Grand Dragon" of the regional KKK, William Dodge, and members of Dodge's "inner circle." Between August and October of 1993, Waldron was approached by members of the KKK who sought to obtain explosives and conversion kits for firearms. Waldron was instructed to tell the KKK members that he might be able to ac-

1. Mr. Borkoski requested, and received, permission to file a Reply Brief, captioned a "Traverse." The Government then responded with a "Reply to Petitioner Edmund S. Borkoski's Response to Government's Response to defendant's Pro Se Motion Pursuant to 28 U.S.C. § 2255." The Government did not seek leave to file this "Reply," which should

have properly been captioned a "sur-reply," and the majority of the brief also violates Local Rule 9(a)(2), in that it is single-spaced. Accordingly, the Court will not consider this last "Reply" in determining Mr. Borkoski's habeas petition. Petitioner's Motion to Strike (Doc. # 148) is therefore GRANTED.

commodate them through a source in Massachusetts.

In a recorded conversation, Waldron conveyed his plans to obtain explosives and firearms for other members of the KKK to Dodge. At that point, Dodge asked Waldron to acquire explosives for him. The two agreed to meet again to discuss the deal. On December 8, 1993, Waldron met with Dodge and defendant Borkoski at Dodge's home, where Waldron provided the two men with a list of illegal firearms, silencers and explosives. Borkoski ordered a .25 caliber handgun with a silencer. Dodge said he wanted five pipe bombs and an automatic weapon.

61 F.3d at 143–44. The evidence at trial also consisted of Waldron's testimony regarding conversations and meetings with Dodge, Borkoski, and others, as well as a number of tape recordings of those conversations. In a recorded conversation between Dodge, Borkoski, and Waldron at Dodge's residence on December 8, 1993, Waldron asked Borkoski if he wanted to "buy any guns," to which Borkoski responded "Yup. What are you interested in selling?" Gov. Ex. 2T at p. 6. Waldron showed Borkoski the list, he inquired about the prices of specific weapons, and stated that he was particularly interested in a .25 caliber weapon with a silencer, because if he had to "pop" the Jamaican man that his sister was dating, "that'll be perfect." *Id.* at 8.

According to both the Government and Borkoski,[2] Waldron also testified that he spoke with Dodge and Borkoski on December 17, 1993, although that conversation was not recorded because Mr. Waldron was at the residence of KKK associates Steven Gray and Scott Palmer. According to Waldron's trial testimony, he received a call from Dodge, who at one point put Mr. Borkoski ("his buddy") on the telephone because he wanted to discuss delivery of the silencer and firearm. According to Mr. Borkoski, this conversation never occurred, and he points to an ATF Investigation Report dated December 20, 1993, in which Waldron (known as "CI–84" in the investigative documents) "advised that at some point during his/her visit, Bill Dodge telephoned Scott Palmer. Dodge subsequently asked to speak with CI–84 and stated that "Ed" wanted to know how long before he could get hold of the "items" (handgun and silences) they had discussed. Dodge advised that he to (sic) was ready to place his order." Pet. Ex. A. In petitioner's pro se brief, he maintains that he informed his trial counsel that he was not present at Dodge's house at the time of the call, and that he confirmed this fact by a call to his former employer the next morning, before trial and Waldron's cross-examination resumed. Petitioner also learned that the government had recently served a subpoena on his former employer to obtain employment records, and he informed his counsel of the existence of these records and that any time records would serve to confirm his alibi for the period in question. According to petitioner's brief, trial counsel dismissed the employment records as "nothing of consequence" and declined to inquire into the discrepancy between Mr. Waldron's trial testimony and the ATF Investigation Report. Attorney Maxwell did, however, elicit from Waldron that the telephone call from Dodge was received at some point

---

2. The trial transcripts are not part of the file, and neither petitioner nor the government have provided the Court with copies. The content of Waldron's testimony, however, does not appear disputed; rather, the central issue on which petitioner and the Government part company is the extent of the discrepancy between Waldron's trial testimony and contemporaneous reports.

between five and eleven in the evening. Mr. Borkoski has included a copy of his time-sheet from his employer indicating that he worked eight hours and then seven and a half hours of overtime on December 17, 1993. Pet. Ex. B. According to Mr. Borkoski's brief, he did not leave work until 11:30 that evening.

Waldron also recorded a telephone conversation with Dodge on December 23, 1993, in which Dodge asked whether Waldron was going to "do that for my friend ... My friend. Remember? You, me, and my friend were here." Gov. Ex. 4T at 1.[3] Dodge also directed Waldron to take care of "Klansmen" first, and not to sell weapons to Gray because of his fear that Gray was under investigation by the ATF. *Id.* In a December 30, 1993 recorded telephone conversation, Waldron again asked Dodge about "Ed's" order, and told him that he (Waldron) needed a "model number." Gov. Ex. 5T at 1. Waldron told Dodge to have Borkoski call him, and discussed further details regarding Dodge's order for a pipe bomb. *Id.* A January 9, 1994 meeting was also recorded, during which Waldron and Dodge discussed the details of the caliber weapon that Waldron was to obtain for Borkoski. Gov. Ex. 6T at 8. The next day, Waldron recorded a telephone conversation with Borkoski directly in which Borkoski explained that he would be unable to meet with Waldron to view the proposed "items" on Saturday night, but that he "could leave something with Bill [Dodge]" and that in reference to the "choices" that Waldron had available, Borkoski would "tell Bill what I'm looking for and leave it at that." Gov. Ex. 7T at 2. Cognizant of Dodge's warning at the beginning of the conversation to "remember about the phone," *id.* at 1, Waldron also

attempted to discuss silencers with Borkoski in a form of code:

> Waldron: Uh, you want, um, I gotta figure out how to say this. Da da da, okay, um, you want the attachments for the uh
>
> Borkoski: Yup, um ...
>
> Waldron: Okay
>
> Borkoski Yup
>
> Waldron: Alright
>
> Borkoski: The cylinoids?
>
> Waldron: Yeah, cylinoids.
>
> Borkoski: They're tricky little bastards.

*Id.* at 3–4. At trial, Borkoski conceded that "attachments" and "cylinoids" referred to silencers.

A further telephone conversation between Dodge and Waldron was recorded on January 11, 1994 in which Waldron arranged to pick up the money for the purchases from Dodge on Friday, and then deliver the "stuff" on Friday or Saturday. Gov. Ex. 8T at 1. Dodge explained that "Ed" would stop by with his money on Thursday night, and when informed that Waldron's "source" did not have the twenty-five caliber handgun that Borkoski had requested, directed Waldron to "the nine (millimeter handgun) for Ed." *Id.* at 4. Two days later, the Government recorded Dodge telling Waldron that Borkoski had indeed dropped off $150, the price quoted for the nine millimeter handgun, Gov. Ex. 9T at 2, and on Saturday, January 15, 1994, Waldron picked up the money, stating in a recorded conversation that "150 is Ed's, and the other 100's yours." Gov. Ex. 10T at 2. Later that same day, Waldron called Dodge and told him that he "went with that, un, 2–5 for, uh, your buddy there," Gov. Ex. 11T at 2, and on January 21, 1994, Waldron and Special Agent Mark

---

**3.** During the initial meeting between Dodge, Borkoski, and Waldron, Dodge indicated that he did not wish to discuss the purchase of firearms over the telephone, see Gov. Ex. 2T at 16, thus explaining the cryptic nature of Dodge's inquiry.

Curtin (posing as Waldron's "source") delivered a bag containing pipe bomb components, a handgun and a silencer. Gov. Ex. 12T. Waldron directed Dodge to "tell Ed you got to get a clip for [the handgun]." *Id.* at 3. Dodge and then Borkoski were arrested shortly thereafter.

## Discussion

The Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 81–82, empowered federal courts in the district in which a prisoner was confined to issue a writ of habeas corpus if the prisoner was "in custody, under or by colour of the authority of the United States." *See McCleskey v. Zant,* 499 U.S. 467, 477–78, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In 1867, the writ was made available to any federal prisoner "restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." Act of February 5, 1867, ch. 28, § 1, 14 Stat. 385; *see Kaufman v. United States,* 394 U.S. 217, 221, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969). Today, federal courts continue to retain jurisdiction to entertain habeas corpus petitions from federal prisoners "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2255; *see also Triestman v. United States,* 124 F.3d 361 (2d Cir.1997) (discussing historical antecedents of § 2255).

■ While the statute requires that the Court grant a "prompt hearing" and "determine the issues and make findings of fact and conclusions of law with respect thereto," no hearing is required if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ." 28 U.S.C. § 2255. *See also* Rule 4(b) of the Rules Governing Section 2255 Proceedings For the United States District Courts ("If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal."). A hearing should be granted where the petitioner has alleged facts which, if found to be true, would entitle him or her to habeas relief. *See Ciak v. United States,* 59 F.3d 296, 307 (2d Cir. 1995).

■ "Because requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Ciak,* 59 F.3d at 301. Another obstacle in the path of habeas petitioners is the rule of procedural default: they cannot assert claims they failed to raise at trial or on direct appeal unless they can show "cause" for the default and "prejudice" resulting from it. *Id., citing Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (denying habeas corpus review of claim that confession was admitted in violation of Miranda rule where petitioner failed to object at trial as required by state "contemporaneous objection" rule). The Government contends that these habeas rules require the dismissal of the instant petition.

## A. Procedural Bar

■ On direct appeal, Mr. Borkoski only challenged the application of the registration statute to his conduct, arguing that because the statute was a taxing measure that may be invoked only to the extent it aids in the collection of taxes, and because the federal government was exempt from paying the transfer tax on the weapons in question, enforcement of the registration requirements was unconstitutional in his case. He did not raise any claims challenging the truthfulness of Waldron's testimony, or his trial counsel's ef-

fectiveness. The failure of a federal defendant to raise an issue on direct appeal will bar the defendant from raising the issue for the first time in a habeas petition unless the defendant can show "cause and actual prejudice." *United States v. Canady,* 126 F.3d 352, 359 (2d Cir.1997). Mr. Borkoski has failed to make this showing in connection with his claim that the government knowingly put on false testimony, or should have known that Waldron's testimony regarding the December 21 conversation was false.

■ While "cause can be established by showing that the claim is based on newly discovered evidence that could not reasonably have been [previously] discovered," *United States v. Helmsley,* 985 F.2d 1202, 1206 (2d Cir.1993), Borkoski's evidence is not new. He had access to some of the information underlying his claim that Waldron's testimony was perjurious at the time of trial (his own recollection and his work records), and in his *pro se* memorandum he states his belief that the ATF report "was disclosed to the petitioner and his counsel through the Government's Brady discovery responses." Doc. # 140, Mem. in Support at 11. He presents no other rationale for why this argument was not advanced sooner, save his claim of ineffective assistance of counsel.

■ Petitioner is correct that the Second Circuit has recognized an exception to the "cause and prejudice" rule for claims of ineffective assistance of counsel, *see Billy–Eko v. United States,* 8 F.3d 111 (2d Cir.1993), and has expressed a "baseline aversion to resolving ineffectiveness claims on direct appeal." *United States v. Williams,* 205 F.3d 23, 35 (2d Cir.2000). These principles do not excuse petitioner's failure to raise the claim, however, for the facts of *Billy–Eko* demonstrate the narrowness of this exception. In that case, the Second Circuit held that a habeas petitioner (1) who was represented by new counsel on direct appeal and (2) whose ineffective assistance claim is "based solely on the record developed at trial" may not raise, absent a showing of cause and prejudice, an ineffective assistance claim in his § 2255 habeas petition if he did not raise it on direct appeal. *Billy–Eko,* 8 F.3d at 115. The Second Circuit has recently noted that *Billy–Eko* recognized the principle "that appellate counsel are encouraged to err on the side of including an ineffective assistance claim on direct appeal, even if there is a need for further extrinsic evidence, to preclude the possibility of procedural forfeiture." *United States v. Diaz,* 176 F.3d 52, 114 (2d Cir.1999), *citing Billy–Eko,* 8 F.3d at 116. As noted above, Mr. Borkoski was represented by different appellate counsel when he took his direct appeal, and his habeas claim of ineffective assistance is confined to his trial counsel's failure to rigorously cross-examine Waldron on purported discrepancies regarding the December 17 conversation, and to sufficiently investigate the "trumped up" telephone call. These matters are completely encompassed by the trial record, and thus there was no reason the issue could not have been presented by new counsel on appeal.

Mr. Borkoski is thus procedurally barred from pursuing his claims.

**B. Substantive Merits of Mr. Borkoski's Claims**

Even if Mr. Borkoski could demonstrate cause and prejudice for his failure to raise the Waldron issue and his ineffective assistance of counsel claim on direct appeal, dismissal of the petition would still be appropriate.

1. *Governmental Misconduct in Regards to Waldron's Testimony*

■ Petitioner argues that, based on the discrepancy between the ATF report

dated December 20, 1993 and Waldron's testimony at trial regarding the December 17, 1993 telephone conversation, Waldron's testimony at trial was false, and the government either knew of the falsity or should have known that it was introducing perjured testimony. This contention lacks merit.

 Mr. Borkoski relies on cases raising the issue of perjured testimony on direct appeal. If evidence indicates that testimony given at trial was perjured, the grant of a new trial depends on "the materiality of the perjury and the extent to which the prosecution was aware of the perjury." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991). If the government knew or should have known about the perjury, a new trial is warranted if there is any reasonable likelihood that the false testimony "could have affected the judgment of the jury," *id.*, although there is some law in this circuit indicating that in such a situation, a new trial is "virtually automatic." *See United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) (in situation where government knowingly offers perjured testimony). If the government was unaware of the perjury at the time of the trial, a new trial is warranted "only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.*, citing *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988). In *Wallach*, a mail fraud and racketeering case, the perjuring witness offered "the only testimony that directly linked the defendants with the admittedly illegal conduct" of a company, and the government conceded that the witness had committed perjury at the trial when he testified that he had not gambled for a certain period of time, and that he had stopped gambling at the direction of the prosecutors because of a "moral trans-

formation." *Id.* at 457. In fact, the witness had signed gambling 'markers' during the time period in question and had so admitted on cross-examination, yet instead of "proceeding with great caution" in the face of this likely perjury, the government sought to rehabilitate him on re-direct by eliciting his "dubious explanation" for the inconsistencies. 935 F.2d at 456. Because the witness was the "centerpiece of the government's case," and because "[i]t was one thing for the jury to learn that [the witness] had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie," the Second Circuit reversed the conviction. *Id.* at 456. *Wallach* also involved newly-discovered evidence of the government's knowledge of the extent of the witnesses perjury. *Id.* at 457.

*Wallach* is distinguishable from the case at bar. The ATF Report and Waldron's trial testimony are not so diametrically opposed that the Court must conclude there was purposeful deceit on the part of the witness. As the Government emphasizes, the ATF Report was prepared at a time when Dodge was the focus of the investigation, and as such the report would have focused on discussions between Dodge and Waldron. The report is the ATF agent's version of the conversation as reported by Waldron after the fact, and these degrees of separation further limit the inferences that must be drawn from the inconsistencies between the report and his testimony. The report also does not conclusively preclude the possibility that Borkoski was in the room with Dodge at the time of the telephone conversation at issue, and as such the discrepancy does not demonstrate that Waldron, unlike the witness in *Wallach*, made "a conscious decision to lie." While Borkoski points to Waldron's incentives to ingratiate himself

with the government, such as his desire to be a police officer and the money he was paid, a mistake as to whether he spoke with Borkoski or merely had a message from Borkoski passed on by Dodge during one of many telephone conversations does not rise to the level of the deliberate perjury found in *Wallach*.[4] The Second Circuit has stated that "even a direct conflict in testimony does not in itself constitute perjury," *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir.1995), and the evidence cited by Borkoski does not rise to the threshold of a direct conflict.

Further, while the timesheets and the ATF Report submitted by Borkoski in his habeas petition would have certainly provided the grounds for an argument that Waldron was lying when he testified that he spoke with Borkoski on December 17, 1993, all of this information was known to petitioner and his counsel at the time of the trial. Borkoski states in his memorandum that he "believes" that the ATF Report was disclosed to him prior to trial, and he himself contacted his employer regarding his work schedule on the morning before Waldron's cross-examination continued. Whether Waldron's counsel's failure to take up the issue constituted ineffective assistance will be discussed below, but he has presented insufficient reason why the Court should address Waldron's purported perjury on habeas. Nor can Borkoski's timesheets be considered "newly discovered evidence," because the basic information contained in those timesheets was known to both petitioner and his counsel at the time of trial: that Borkoski was working on the day in question. Borkoski's argument that the Government had copies of his timesheets and thus must be presumed to know of Waldron's perjury is also not persuasive. The subpoena that

was issued to his former employer several days before the trial calls for "[a]ny and all personnel files," not timesheets, and the Government represents in its brief—without affidavit—that the personnel file obtained pursuant to included wage, tax, and benefits information, but not timesheets. Gov. Mem. at 20.

Finally, even assuming for purposes of this analysis that Waldron was lying when he stated that he spoke with Borkoski, rather than with Dodge *about* Borkoski, and even further assuming that the government should be charged with knowledge of this deceit based on the ATF Report, the relaxed *Wallach* standard still would not mandate vacating Borkoski's conviction. *Wallach* requires that a conviction be set aside if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 935 F.2d at 456. Borkoski conceded at trial that he discussed the purchase of the firearm and the silencer both before and after the challenged December 17, 1993 conversation. On December 8, 1993, Borkoski was recorded discussing the purchase of a handgun equipped with a silencer at a meeting with Dodge and Waldron, and on January 10, 1994 Borkoski was recorded discussing the logistics of selecting a particular weapon and transferring the money with Waldron on the telephone. *See* Gov. Ex. 1T, 7T. There are further conversations with Dodge in which he inquires into the status of Borkoski's "order," and in which he states that Borkoski dropped off $150 for the purchase of the gun—an amount Borkoski admitted to giving to Dodge, but which he claimed at trial (and maintains still) was a refund for repairs to a car Dodge had bought from Borkoski. The jury rejected this contention, and the Court cannot conclude that

---

4. In *Wallach,* the government conceded that the witness had perjured himself, and in fact

he was convicted of two counts of perjury in a later proceeding. *See* 935 F.2d at 455, n. 2.

had Waldron's untruthfulness regarding the December 17, 1993 conversation been fully explored, his credibility regarding Borkoski's involvement would have been so diminished that Borkoski would not have been convicted. *See Gambino,* 59 F.3d at 365.

### 2. *Ineffective Assistance of Counsel*

The second prong of Borkoski's habeas attack is on the performance of his appointed counsel, John D. Maxwell, and Maxwell's failure to "investigate the trumped up phone call of December 17, 1993" and to "attack the credibility of Mr. Waldron with regard to the various conversations and distorted interpretations of conversations about which Mr. Waldron testified." Pet. Mem. at 17. The guarantee of counsel in criminal trials protects the fundamental right to a fair trial that is embodied in the Sixth Amendment, and to give substance to this right, counsel must be reasonably effective. *See Lindstadt v. Keane,* 239 F.3d 191, 198 (2d Cir.2001). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish two elements: (1) that counsel's performance "fell below an objective standard of reasonableness," and (2) that there is a "reasonable probability" that, but for the deficiency, the outcome of the proceeding would have been different. *See McKee v. United States,* 167 F.3d 103, 106 (2d Cir.1999), *citing Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

To determine whether a counsel's conduct is deficient, "[t]he court must ... determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. In gauging the deficiency, the court must be "highly deferential," must "consider[ ] all the circumstances," must make "every effort ... to eliminate the distorting effects of hindsight," and must operate with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...." *Id.* at 688–89, 104 S.Ct. 2052.

The Government argues that Borkoski's claim does not meet this standard, as Maxwell rigorously cross-examined Waldron for approximately 40 pages of the trial transcript, including questioning him as to whether he spoke to Borkoski as well as Dodge on December 17, 1993, and the particular time the conversation occurred. Maxwell did not, however, ask Waldron to explain the discrepancy between his trial testimony and the ATF Report, and he did not take up petitioner's suggestion that Waldron be questioned on Borkoski's "alibi" that he was at work at the time of the purported conversation. Nonetheless, the Government argues that impeaching Waldron on this point would have been of little benefit to Borkoski, because the defense "strategy" was to show that after the January 10, 1994 telephone conversation, Borkoski did not further pursue his initial attempts to obtain a handgun and silencer, and that the $150 he admittedly provided to Dodge was for some other purpose. Highlighting inconsistencies in a statement previous to the January 10 conversation would have done little to help Borkoski, the Government argues, when the entire point of defendant's trial strategy focused on the period of time *after* the last recorded conversation between Borkoski and Waldron.

The Court need not decide whether Maxwell's deficiencies fell below the constitutional standard of reasonableness, however, because even if his failure to pursue this line of questioning with Waldron fell "outside the wide range of professionally competent assistance," *Strickland,*

466 U.S. at 690, 104 S.Ct. 2052, Borkoski has failed to show that these errors prejudiced him. A successful ineffective assistance claim requires both deficient performance *and* prejudice, "in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. White*, 174 F.3d 290, 294 (2d Cir.1999), *quoting Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. As noted above, Borkoski was recorded speaking with Waldron about the gun and silencer both before and after the challenged December 17, 1993 conversation. The December 8, 1993 conversation revealed Borkoski's motives in obtaining the gun, and his interest in avoiding detection by ensuring that the gun had no numbers that would "tie it back" to him. Gov. Ex. 2T at 10. On January 10, 1994, Borkoski and Waldron again discussed his "order" for the gun with the silencer, and while the attempted "code" renders this latter conversation rather cryptic, Borkoski by no means "cancels" his order. Further, Dodge provided numerous statements indicating Borkoski's involvement, including his frequent reminders to Waldron to take care of "his buddy" and his statement that Borkoski had brought over the $150 as directed. *See, e.g.*, Gov. Ex. 4T at 1; Gov. Ex. 8T at 3; Gov. Ex. 9T at 2. In light of these facts, the Court agrees that the December 17, 1993 conversation was of "comparatively minor significance" in the context of the case. Gov. Mem. at 26.

 Borkoski emphasizes that Waldron was the sole government witness against him, and that his credibility was essential to the case because the government did not introduce "one piece of evidence ... which set forth the petitioner's clear desire and unequivocal intention to enter into a conspiracy to purchase a silencer in violation of the National Firearms Act." Borkoski characterizes the case against him as being built on "circumstantial evidence and hearsay" which transformed the "bravado statements" of a gun enthusiast who was "intrigued" by what Waldron had to offer into a federal criminal conspiracy case. Conspiracy law, however, allows a case to be built on just such types of evidence. Dodge's statements to Waldron in furtherance of the conspiracy were clearly admissible against Borkoski under Fed.R.Evid. 801(d)(2)(E), and the law makes no distinctions between circumstantial and direct evidence, as long as it is probative of the issue before the jury. *See United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir.1989) (noting that in conspiracy case, jury must often piece together circumstantial evidence, and that "[c]ircumstantial evidence ...if relied upon by the jury, is of no lesser probative value than direct evidence."), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). As for Mr. Borkoski's justifications for his statements (justifications which he must provide to advance his habeas petition, as he was recorded discussing the purchase of a gun with a silencer for the purpose of "pop[ping]" his sister's Jamaican boyfriend), the jury had the opportunity to evaluate them, and Mr. Borkoski's credibility, when he testified at trial. The jury rejected his version of the events of December and January 1993–1994, and he has presented no grounds for this Court to find that the trial was constitutionally flawed, based simply on the difference between the ATF Report and Waldron's trial testimony.

### Conclusion

While petitioner's pro se brief is well-framed and even, at times, eloquent, it does not provide cause for habeas relief. Mr. Waldron's testimony regarding the December 17,1993 conversation simply was not material to Mr. Borkoski's conviction,

and both the government's conduct in offering his testimony and his counsel's conduct in failing to sufficiently impeach it did not violate his right to a fair trial or the Sixth Amendment's guarantee of effective assistance of counsel. Petitioner's Motion to Strike (Doc. # 148) is GRANTED, and the petition is DISMISSED.

IT IS SO ORDERED.